J-A30020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOSE SANTOS FERRUFINO | : | |
| | : | |
| Appellant | : | No. 530 MDA 2019 |

Appeal from the Judgment of Sentence Entered January 30, 2019
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002349-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOSE SANTOS FERRUFINO | : | |
| | : | |
| Appellant | : | No. 531 MDA 2019 |

Appeal from the Judgment of Sentence Entered January 30, 2019
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002350-2017

BEFORE:   DUBOW, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 18, 2020**

Appellant Jose Santos Ferrufino appeals from the judgment of sentence imposed following his convictions for first-degree murder, burglary, and related offenses.  Appellant challenges the sufficiency and weight of the evidence.  Following our review of the record, we affirm on the basis of the trial court's opinion.

_____

[*] Retired Senior Judge assigned to the Superior Court.

We adopt the trial court's summary of the facts underlying this matter. *See* Trial Ct. Op., 6/5/19, at 7-41. Briefly, we note that Appellant was arrested and charged with several offenses based on two separate incidents involving Alexander Hugo and Appellant's wife, Patricia Sanchez-Rivera, who were allegedly involved in an extramarital affair.[1]

On December 10, 2018, following a multi-day trial, the jury convicted Appellant of all charges, including first-degree murder. On January 30, 2019, the trial court sentenced Appellant to life without parole for first-degree murder and an aggregate consecutive term of fifteen to thirty-five years' imprisonment for the remaining convictions.

On February 8, 2019, Appellant filed a timely post-sentence motion challenging the weight of the evidence supporting the murder and burglary convictions. After the trial court denied Appellant's motion, Appellant timely filed separate notices of appeal at each docket number.[2] Appellant

---

[1] At CP-36-CR-0002349-2017, Appellant was charged with one count each of burglary, firearms not to be carried without a license, and endangering the welfare of children, two counts of terroristic threats, four counts of simple assault, and four counts of recklessly endangering another person. *See* 18 Pa.C.S. §§ 3502(a)(1), 6196(a)(1), 4304(a)(1), 2706(a)(1), 2701(a)(3), 2705. At CP-36-CR-0002350-2017, Appellant was charged with criminal homicide, burglary, and two counts of conspiracy. *See* 18 Pa.C.S. 2501(a), 3502(a)(1), 903.

[2] Appellant was charged in two cases that were consolidated for trial. The record confirms that Appellant complied with *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), and properly filed separate notices of appeal at each docket number. *See Walker*, 185 A.3d at 977 (stating that "the proper practice under Rule 341(a) is to file separate appeals from an order that

- 2 -

subsequently filed a court-ordered Pa.R.A.P. 1925(b) statement challenging the weight and sufficiency of the evidence supporting his murder and burglary convictions. The trial court issued a Rule 1925(a) opinion addressing Appellant's claims.

On appeal, Appellant raises the following issues, which we have reordered as follows:

1. Whether the evidence introduced at trial and all reasonable inferences derived from the evidentiary record, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish all elements of first-degree murder beyond a reasonable doubt?

2. Whether the evidence introduced at trial and all reasonable inferences derived from the evidentiary record, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish all of the elements of burglary beyond a reasonable doubt?

3. Whether the lower court erred in denying [Appellant's] post-trial motion for judgment of acquittal by order dated April 1, 2019 where the jury verdict was against the weight of the evidence as a matter of law to establish the [Appellant's] guilt beyond a reasonable doubt on all charges?

4. Whether the trial court abused its discretion in denying Appellant's post-trial motion for judgment of acquittal by order dated April 1, 2019[,] since the jury verdict was against the weight of the evidence as a matter of law to establish the [Appellant's] guilt beyond a reasonable doubt on all charges

_____

resolves issues arising on more than one docket. The failure to do so requires the appellate court to quash the appeal"). The fact that Appellant listed both docket numbers on each notice of appeal does not affect our conclusion. *See* *Commonwealth v. Johnson* 236 A.3d 1141, 1144 (Pa. Super. 2020) (*en banc*) (partially overruling *Commonwealth v. Creese*, 216 A.3d 1142 (Pa. Super. 2019), and declining to "invalidate an otherwise timely appeal based on the inclusion of multiple docket numbers").

because certain facts were not given greater weight but were ignored or given equal weight with all the facts?

Appellant's Brief at 6.

Following our review of the record, the parties' briefs, and the well-reasoned conclusions of the trial court, we affirm on the basis of the trial court's opinion. Specifically, we agree with the trial court that there was sufficient evidence to support Appellant's convictions for first-degree murder and burglary.[3] **See** Trial Ct. Op. at 44-49. Additionally, we find no abuse of discretion by the trial court in rejecting Appellant's weight claims. **See id.** at 49-52. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/18/2020

---

[3] We add that, to the extent Appellant claims that the jury should have convicted him of voluntary manslaughter instead of first-degree murder, he raises this claim for the first time on appeal. Appellant did not raise a heat-of-passion defense at trial, nor did he request a jury instruction on voluntary manslaughter. Therefore, this claim is waived. **See** Pa.R.A.P. 302 (stating that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**C R I M I N A L**

COMMONWEALTH OF PENNSYLVANIA  :

             v.              :        Nos. 2349-2017, 2350-2017

JOSE SANTOS FERRUFINO     :

**OPINION SUR PA.R.A.P. 1925(a)**

BY:   ASHWORTH, J., JUNE 5, 2019

On December 10, 2018, Jose Santos Ferrufino was convicted of criminal homicide[1] arising from the shooting death of Hugo Ernesto Garcia-Hernandez in Providence Township, Lancaster County, on March 22, 2017. Hugo was executed[2] because of his relationship with Ferrufino's wife, Patricia Delapaz Sanchez-Rivera.

On April 2, 2019, Ferrufino filed an appeal to the Superior Court of Pennsylvania from this Court's judgment of sentence entered on January 30, 2019, as finalized by the denial of Ferrufino's post-sentence motion on April 1, 2019. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## I.   Background

At Information Number 2350-2017, Appellant was charged with one count of burglary, one count of firearms not to be carried without a license, two counts of

---

[1] 18 Pa.C.S.A. § 2501(a).

[2] Wayne K. Ross, M.D., forensic pathologist for Lancaster County, testified that Hugo was killed by an "execution-style shot, which means the intent was to get to the vital area of the body." Notes of Testimony, Trial (N.T.T.) at 294.

terroristic threats, one count of endangering the welfare of children, four counts of simple assault, and four counts of recklessly endangering another person.[3] In the criminal complaint, the Commonwealth alleged that Appellant arrived at the victim's residence at 124 Pennsy Road in Providence Township, on December 24, 2016, and upon exiting his vehicle pulled a gun and fired one shot into the air. He then used his cell phone to call his wife, Patricia, to order her outside as he forcibly entered the residence through the side kitchen door. Appellant proceeded to the living room, drew the gun, pointed it at the victim, Hugo, and said, "I don't care about killing you." Patricia stepped between Appellant and Hugo, and Appellant held the gun to Patricia and said, "look, if we were in El Salvador you'd be dead, I would have shot you." These charges were filed on March 23, 2017, and Appellant was arrested on March 23, 2017. Bail was set at $500,000.00. Appellant was unable to post bail and was committed to Lancaster County Prison (LCP). Private counsel, Robert D. Beyer, Esquire, entered his appearance for Appellant on these charges.

On April 3, 2017, Appellant was charged at Information Number 2349-2017 with one count of criminal homicide, one count of burglary, and two counts of conspiracy.[4] The Commonwealth alleged, in part, that on March 22, 2017, Appellant unlawfully entered Hugo's home at 124 Pennsy Road, restrained him with zip ties, assaulted him with a beater bat, and then shot him in the front upper left torso area, causing his death.

---

[3] 18 Pa.C.S.A. § 3502(a)(1), 18 Pa. C.S.A. § 6106(a)(1), 18 Pa.C.S.A. § 2706(a)(1), 18 Pa. C.S.A. § 4304(a)(1), 18 Pa.C.S.A. § 2701(a)(3), and 18 Pa.C.S.A. § 2705, respectively.

[4] 18 Pa.C.S.A. § 2501(a), 18 Pa.C.S.A. § 3502(a)(1), and 18 Pa.C.S.A. § 903, respectively.

2

Alejandro Cruz-Santiago was charged as a co-conspirator in the death of Hugo.[5] On May 18, 2017, the Commonwealth filed a notice of intent to consolidate the cases of Appellant and his co-defendant, Cruz-Santiago.[6]

Appellant's formal arraignment on both dockets took place on June 9, 2017. The Public Defender's Office, specifically, Phillip A. Michael, Esquire, entered an appearance for Appellant on June 30, 2017. Thereafter, Attorney Edwin Pfursich, IV, was court-appointed to represent Appellant on January 3, 2018.

On June 26, 2018, the Commonwealth filed a "Notice of Intention to Introduce Evidence of Other Crimes, Wrongs or Acts Pursuant to PA Rule of Evidence 404(b) and Character Evidence Pursuant to PA Rule of Evidence 406" and brief in support thereof. The Commonwealth sought to introduce evidence that on December 31, 2016, Appellant appeared uninvited at a New Year's Eve party at 348 South Ann Street, in the City of Lancaster, and threatened Hugo, presumably over the deceased's relationship with Appellant's wife. The Commonwealth had further evidence that in January 2017, Appellant solicited assistance from a third-party to go with him to Hugo's residence and "threaten him" and "scare him" and steal his money. Additional evidence came to light that in February 2017, Appellant solicited assistance from a third-party to trade a shotgun to Appellant for Appellant's handgun, specifically for the purpose of "roughing

---

[5]Cruz-Santiago was charged with criminal homicide, burglary, and two counts of conspiracy at Information Number 2365-2017.

[6]Cruz-Santiago's case was later severed from Appellant's because Cruz-Santiago agreed to be a witness for the Commonwealth in its case against Appellant. N.T.T. at 4, 6. As of the date of this Opinion, Cruz-Santiago was scheduled to enter a guilty plea to his charges before the undersigned on June 6, 2019.

3

up" and "blowing away" "the guy [his wife] was sleeping with," as well as other threats towards the victim.

The Commonwealth also sought to introduce evidence that in 2009 Appellant threatened to kill his former paramour, Adelaida Torres, with a knife and assaulted her, which resulted in the filing of criminal charges and a protection from abuse order against Appellant. Finally, the Commonwealth uncovered four current or former prisoners at LCP who alleged that Appellant solicited them to engage in criminal acts related to tampering with evidence and/or intimidating witnesses relative to his charges (as well as confessing his crimes to them).

A jury trial was originally scheduled for September 17, 2018. At the request of defense counsel, the trial was continued to December 3, 2018. On November 13, 2018, Appellant and the Commonwealth filed with the Court a "Stipulation of Facts, Evidence and Chain of Custody" with respect to the homicide investigation including, but not limited to, crime scene processing, execution of search warrants, evidence collection, chain of custody of evidence, and witness interviews by numerous Pennsylvania State Police Troopers and other criminal investigators.

A jury trial convened on December 3, 2018. As a preliminary matter, the parties discussed the Commonwealth's "Notice of Intention to Introduce Evidence" pursuant to Pennsylvania Rules of Evidence 404(b) and 406. N.T.T. at 13. The 2009 matter involving the alleged threat by Appellant to kill his former paramour was ruled inadmissible as evidence of other crimes, wrongs or acts pursuant to Pa.R.E. 404(b). Id. All other matters raised in the Commonwealth's Notice were ruled admissible. Id. at 13-14.

4

At the conclusion of the trial on December 10, 2018, Appellant was found guilty of first degree murder and all other counts from both docket numbers. Sentencing was deferred pending a pre-sentence investigation.

On January 30, 2019, Appellant stood for sentencing. Because the Commonwealth did not seek the death penalty, Appellant received a sentence of life without parole for the offense of first-degree murder.[7] Appellant received an additional consecutive term of 15 to 35 years of incarceration on the other non-murder convictions.[8] Restitution in the amount of $16,268.90 was imposed, as well as costs of prosecution.

On February 8, 2019, Appellant, through counsel, filed a timely post-sentence motion averring a verdict against the weight of the evidence. Specifically, Appellant claimed that: (1) no reasonable jury could have found the Commonwealth's primary witness, Cruz-Santiago, credible; (2) Appellant's testimony was credible; and (3) the jury improperly disregarded the significance of the lack of physical or forensic evidence tying Appellant to the murder scene. *See* Post-Sentence Motion at ¶¶ I(A)-(C). The Commonwealth filed a response to Appellant's post-sentence motion on March 14,

---

[7]The Crimes Code provides that "a person who has been convicted of a murder of the first degree . . . shall be sentenced to death or to a term of life imprisonment. . . ." 18 Pa.C.S.A. § 1102.

[8]At No. 2349-2017, Appellant received the following sentence: (1) burglary, four years six months to ten years; and (2) criminal conspiracy, four years six months to ten years. At No. 2350-2017, Appellant was sentenced to: (1) four years six months to ten years for burglary, consecutive to No. 2349-17; (2) two years to seven years for firearms not to be carried without a license; (3) nine months to five years for terroristic threats (two counts); (4) one year six months to five years for endangering welfare of a child, consecutive to Count 1 burglary; (5) and concurrent sentences of six months to two years for the remaining eight counts of simple assault (4 counts) and recklessly endangering (4 counts). This results in an aggregate sentence of life, plus 15 to 35 years' incarceration.

5

2019, denying the claims raised in the motion and asserting that the evidence against Appellant was "absolutely overwhelming." *See* Commonwealth Response at ¶ 1.

Private counsel, A. Charles Peruto, Jr., Esquire, entered his appearance on March 1, 2019, at Docket No. 2350-17, and on April 1, 2019, at Docket No. 2349-17. An order was entered on April 1, 2019, denying Appellant's post-sentence motion without a hearing. A timely notice of appeal was filed with the Superior Court of Pennsylvania on April 2, 2019.[9]

---

[9]On February 11, 2019, despite being represented by counsel, Appellant filed a *pro se* notice of appeal from his judgment of conviction and sentencing at Docket No. 2350-2017 (non-homicide charges). *See* **Commonwealth v. Crawford**, 17 A.3d 1279, 1281 (Pa. Super. 2011) ("Under the prisoner mailbox rule, we deem a *pro se* document filed on the date it is placed in the hands of prison authorities for mailing."). Although docketed on February 19, 2019, this notice of appeal was not forwarded by the Clerk of Court to Appellant's attorney of record, was not brought to this Court's attention, and was not sent to the Superior Court pursuant to Pa.R.A.P. 902 (note).

In this Commonwealth, hybrid representation is generally not permitted. *See* **Commonwealth v. Williams**, 151 A.3d 621, 623 (Pa. Super. 2016). However, the Superior Court Internal Operating Procedure 65.24 addresses hybrid representation in the context of a notice of appeal as follows, in pertinent part:

> Where a litigant is represented by an attorney before the Court and the litigant submits for filing a petition, motion, brief or other type of pleading in the matter, it shall not be accepted for filing, but noted on the docket and forwarded to counsel of record.
> Exceptions:
>> 1. A *pro se* notice of appeal received from the trial court shall be docketed, *even in instances where the pro se [appellant] was represented by counsel in the trial court*. . . .
> 210 Pa. Code § 65.24 (emphasis added).

Id. at 623-24. Thus, there was a clear breakdown in the operation of the courts when the Clerk of Court failed to transmit Appellant's *pro se* notice of appeal to the Superior Court, which filing would have been docketed by the appellate court despite Appellant having an attorney of record. *See* 210 Pa. Code § 65.24.

It is likely, however, that even had the *pro se* notice of appeal been received and docketed by the Superior Court, the appeal would have been quashed as interlocutory due to the pending post-sentence motion before the trial court. *See* **Commonwealth v. Rigg**, 84 A.3d 1080, 1082 n.1 (Pa. Super. 2014) (*citing* **Commonwealth v. Borrero**, 692 A.2d 158, 159-60 (Pa. Super. 1997) ("If post-sentence motions are timely filed, . . . the judgment of sentence does not become final for purposes of appeal until the trial court disposes of the motion.")). Moreover, given the timely notice of appeal following the denial of the post-sentence motion, the *pro se* appeal would have been duplicative. Appellant is now receiving the appellate review he requested on February 11, 2019.

Pursuant to this court's directive, Appellant furnished a statement of matters complained of on appeal which asserts four bases for this appeal: (1) the jury verdict was against the weight of the evidence as a matter of law to establish Appellant's guilt beyond a reasonable doubt on all charges; (2) the trial court erred in denying Appellant's post-trial motion; (3) there was insufficient evidence to establish all elements of first degree murder beyond a reasonable doubt; and (4) there was insufficient evidence to establish all elements of burglary beyond a reasonable doubt. *See* Second Amended Concise Statement at ¶¶ 1-4.[10] For the reasons set forth below, these issues lack merit.

## II.   Discussion

On claims raising evidence insufficiency and weight, a comprehensive review of the evidence presented against the defendant is required. Here, the Commonwealth presented evidence at trial which proved that Hugo was shot and killed at approximately 1:57 a.m. on March 22, 2017, in his home on Pennsy Road in Providence Township. N.T.T. at 151, 280, 479. Dr. Ross, the forensic pathologist for Lancaster County, testified that the cause of death was a gunshot wound to the chest and the manner of death was a homicide. Id. at 280; *see also* Commonwealth Exhibit No. 33 (autopsy report). There was forensic evidence that Hugo put up a fight as there was "forceful impact spatter" of blood in the room, and Hugo had a broken nose, a laceration above

_____

[10]Counsel for Appellant filed a concise statement on April 5, 2019, and an amended concise statement on April 12, 2019, both of which were substantively identical in raising only a weight of the evidence claim, but the original statement had the incorrect date of March 28, 2019, for the Order denying Appellant's post-sentence motion.

7

his right eyebrow from blunt force trauma, a series of 11 cuts over both eyelids and on the right side of his face, and defensive or offensive wounds to his right palm.[11] Id. at 281-82, 284. Dr. Ross testified that the shot that killed the victim "was fired right up close, inches away, at the chest, essentially where the heart is" and it left a one-inch hole in his chest. Id. at 289.

From the physical evidence, Dr. Ross was able to determine that the bullet was fired downward at a 70-to-80-degree trajectory and traveled left to right through the body. N.T.T. at 289. This suggested to Dr. Ross that the killer was taller than the victim, or the victim was lower than the shooter, perhaps on his knees, when he was shot and killed. Id. at 289-90. The victim was discovered lying on his back, arms out, on the mattress. Id. at 283-84.

The Commonwealth introduced further evidence that in the summer of 2016, approximately eight months prior to the murder, Appellant moved out of the marital residence he shared with his wife and son at 1011 Center Avenue in Manheim Township. See N.T.T. at 425, 440. Sometime after moving out, Appellant approached his neighbor, Amanda Garner, who lived across the street from the Center Avenue home and told her that he had separated from his wife and was living in a camper at another location. Id. at 416, 418. Appellant offered to pay Garner cash to watch his house and his wife at night. Id. at 419. Appellant was particularly interested in knowing if a man in a black car ever came to the house. Id. at 418. Garner testified that she

---

[11]Dr. Ross testified that these injuries to the nose and face and hands could have been caused by a "beater bat," a half-size wooden bat. N.T.T. at 286-87. Cruz-Santiago would later testify that Appellant owned a "beater bat" and brought it to Hugo's home the night of the murder. Id. at 821, 824.

8

did, in fact, see a small black sedan parked at the Center Avenue home on several occasions. Id. at 420. Garner identified the vehicle from a photograph as the one belonging to Hugo. Id. at 422.

Another neighbor, Richard Funk, II, testified that in late November or early December of 2016, Appellant approached him and asked him to "basically watch out for his son." N.T.T. at 425-26. Appellant further confided in Funk that his wife was cheating on him. Id. at 426. Multiple times Appellant referred to his wife, Patricia, as a "bitch" and told Funk that if not for his son, he would go back to El Salvador. Id. at 427. Appellant had also previously told Funk that he owned a gun. Id. at 429.

A long-time acquaintance of Appellant's, Jeffrey Johns, testified that after separating from his wife in the summer of 2016, Appellant moved a camper onto a farm on Beaver Valley Pike in Willow Street owned by John Harnish (the "Harnish Farm"). N.T.T. at 433, 440. Appellant had been parking his equipment and trucks for his fencing business at this farm for ten years. Id. at 435. Appellant told Johns that he and his wife were having marital problems and he suspected his wife was "cheating on him" with Hugo. Id. at 437, 438. Johns knew Hugo[12] and had done automotive repair work on his black Honda Civic at Hugo's home on Pennsy Road. Id. at 444-45.

Johns also testified that in the summer of 2016 he purchased a .44 Blackhawk magnum from Appellant that Appellant said he got from a friend who was leaving the country. N.T.T. at 461-62. In September of 2016 Johns saw Appellant with a second firearm – a semi-automatic camouflage green and black handgun. Id. at 439, 441-42,

---

[12]Johns knew Hugo only by his nickname "Oogle." N.T.T. at 443, 445.

9

458. Appellant kept this gun in his silver Dodge crew-cab pickup truck between the front seats. Id. at 440-41, 442.

Around Christmastime of 2016, Appellant asked Johns if he and his friend, Jeff Tedder, "would go with him and beat up . . . [Hugo]," and "scare him" because Appellant's wife was cheating on him with Hugo. N.T.T. at 443, 445-46. Johns testified: "[H]e wanted the three of us to go and beat him up and put a fear into him . . . because he was messing with his wife." Id. at 446. Appellant told Johns that Hugo had "[a]nywhere between a thousand and 5,000" dollars at his house and that Johns could have the money if he beat up Hugo. Id. at 457-58. Johns refused Appellant's request, and further advised Tedder and his wife not to have anything to do with Appellant. Id. at 447. Between Christmas 2016 and March 2017, Appellant discussed his plan with Johns at least three or four times, always complaining about his wife and the situation with Hugo. Id. at 448-49.

The testimony at trial further established that on Christmas Eve, December 24, 2016, Appellant showed up uninvited to the victim's home at 124 Pennsy Road. N.T.T. at 313. Hugo was present, as well as his cousin, Maria Antonia Martinez-Godoy, who was living with him at the time, Appellant's wife, Patricia, and their five-year-old son, Lucas. Id. at 314. Maria was upstairs with Patricia getting ready for church at approximately 6:00 p.m., when she heard a gunshot outside. Id. at 314-15. Maria looked out the second floor window and saw Appellant standing in front of his truck with a gun in his hand. Id. at 315-16.

Appellant came into the house "very angry" and confronted Hugo, who was sitting in a chair in the living room. N.T.T. at 316-17. Appellant took a gun out of his

10

waistband, pointed it at Hugo and said they were "going to talk, man to man." Id. at 318. Appellant told Hugo that he was aware that Hugo "was with his wife." Id. While pointing the gun at Hugo, Appellant said, "It won't cost me anything to kill you." Id. at 319. Appellant then turned the gun on Patricia, who had come downstairs after hearing the gunshot, and told her: "[I]t's a shame you're not in El Salvador. . . . I would have you dead." Id. at 321-22. Finally, Appellant pointed the gun at Maria and said since Maria had moved into Hugo's home, Patricia had been spending too much time there. Id. at 323. Appellant's minor son was present during the gun-weilding and threats. Id. at 322. Hugo did not want anyone to call the police over this incident. Id. at 324.

One week later, on New Year's Eve, Hugo, Patricia and her son, Lucas, were at a party at the home of Eismary Enamorado and Jaime Lopez-Hernandez on Ann Street in the City of Lancaster. N.T.T. at 373; *see also* Id. at 400-01, 403. Again, Appellant showed up uninvited. Id. at 374; *see also* Id. at 404. When Jaime opened the door, Appellant came in quickly and was visibly angry. Id. at 375; *see also* Id. at 405. He asked Patricia where their son was, and Patricia told him Lucas was in the basement with Hugo. Id. at 375-76; *see also* Id. at 405-06. Hugo's uncle, Everardo Hernandez-Garcia, was also present at the party and followed Appellant down the steps into the basement because Appellant was "very angry" and Everardo "thought maybe [Appellant] could do something" after the Christmas Eve incident. Id. at 366, 377; *see also* Id. at 406.

Appellant confronted Hugo in the basement for a second time, asking him, "why are you here with my wife." N.T.T. at 378. Appellant wanted to go outside and fight

11

Hugo. Id. Everardo told Appellant to get out of the house, at which point Appellant accused Everardo of also "running around with his wife." Id. at 379. Appellant left the house without further incident, and without his wife and son. Id.; *see also* Id. at 407. In mid-January 2017, after these two incidents involving Appellant, Eismary helped Patricia change the locks on the door of the marital home on Center Avenue. Id. at 411.

On or about March 11, 2017, Appellant approached a complete stranger, Alejandro Cruz-Santiago, at a Turkey Hill convenience store and offered him work putting up fences. N.T.T. at 788-91. Cruz-Santiago testified that he was employed at the time as a cook at Carlos & Charlie's Restaurant in Lancaster but had off on Mondays and Tuesdays, and Appellant offered him $125.00 for five hours of work on his days off. Id. at 792. The two exchanged cell phone numbers and Cruz-Santiago left the convenience store with his girlfriend. Id. at 792.

Forty minutes later, Appellant called Cruz-Santiago and offered him a ride to work that afternoon. N.T.T. at 792-94. While in Appellant's pick up truck, Appellant retrieved a green and black handgun from the middle console of his truck and showed it to Cruz-Santiago.[13] Id. at 794-95. Thereafter, Appellant called Cruz-Santiago at least twice a day.[14] Id. at 796. Three days after the initial meeting, Appellant showed up at Carlos & Charlie's looking for Cruz-Santiago. Id. at 798-99. They met outside in the

---

[13]Cruz-Santiago told Appellant he was on probation and did not want to be near the gun. N.T.T. at 796.

[14]Cruz-Santiago knew Appellant as "El Chapo" and that is the name that was entered into his phone. N.T.T. at 780-81.

12

back of the restaurant and Appellant told Cruz-Santiago that "a guy" stole a $60,000.00 contract from him and he wanted to go and recover his money. Id. at 799, 806. Appellant told Cruz-Santiago to find a car[15] and an extra person to drive over to this person's house "to beat him up" and get the money. Id. Appellant talked to Cruz-Santiago about this "plan" almost every day thereafter. Id. at 800. Appellant became increasingly aggressive and started yelling at Cruz-Santiago on the phone that he "better hurry up and find people" to help him. Id. at 804. Cruz-Santiago never acted to get a car or a third person to carry out the plan. Id. at 800, 802.

Sometime after March 11, 2017, and before March 21, 2017, Appellant showed up at Carlos & Charlie's with a man he introduced as "Gato." N.T.T. at 801. Appellant said that Gato was going to be the driver when they went to retrieve his money from the man who had stolen his contract. Id. Over this ten-day period, Appellant took Cruz-Santiago home from work almost every day, as Cruz-Santiago did not own a vehicle. Id. at 791, 802.

On March 21, 2017, Cruz-Santiago purchased a light gray Chevrolet Corsica. N.T.T. at 802-04. Between 7:00 and 8:00 p.m. that evening, Cruz-Santiago drove his new car into Lancaster City to show a friend. Id. at 807-08. He got a call from Appellant and Cruz-Santiago told him that he had just purchased a car. Id. at 808. Appellant told him to meet him at the Sunoco in Bridgeport. Id. at 809. Because Cruz-Santiago had never been there, Appellant gave him directions on the phone while he was driving. Id.

---

[15]Cruz-Santiago did not have a car at the time. N.T.T. at 791.

13

Once the men met up at the Sunoco, Appellant told Cruz-Santiago that he wanted him to take him into the City to buy some marijuana. N.T.T. at 809-10. Appellant told Cruz-Santiago to go across the street where Appellant would park his truck and Appellant would drive Cruz-Santiago's car into the City. Id. at 813-15. Appellant said he wanted the marijuana for his girlfriend.[16] Id. at 815. The men were gone for approximately 20 minutes. Id. Upon their return, Appellant got into his truck which was parked on a public street across from the Sunoco and Cruz-Santiago followed Appellant in his car. Id. at 816. Appellant had said that he wanted to show Cruz-Santiago "some stuff at his camper." Id. at 817-18. It was not a long drive from Bridgeport but Cruz-Santiago did not know where he was or where he was going and had to follow Appellant closely. Id. at 819. At one point, Cruz-Santiago lost sight of Appellant's taillights and had to call him for directions. Id.

Eventually, they arrived at Appellant's camper and Cruz-Santiago had a seat inside while Appellant walked to a red house on the property. N.T.T. at 820. Appellant returned and placed a green and black gun on the table – the same one Cruz-Santiago had seen previously in Appellant's truck. Id. at 820-21. Cruz-Santiago also saw a "beater bat" or miniature baseball bat. Id. at 821.

After some idle conversation, Appellant announced that they were going to take the marijuana to his wife. N.T.T. at 822. The men got into Cruz-Santiago's car and Appellant drove. Id. Appellant pulled up to a curb in front of a house, which Cruz-Santiago would later learn belonged to Hugo, and turned off the car and took the keys.

---

[16]Appellant would later tell Cruz-Santiago that he wanted the marijuana to set up the guy they were going to beat up for a drug deal gone wrong. N.T.T. at 816.

14

Id. at 823. Appellant approached a man "in the shadows" in front of the house but Cruz-Santiago did not recognize him.[17] Id. at 823, 825. Appellant told the two men, "we're going to go inside, we're going to tie this guy up," and Cruz-Santiago was directed to run upstairs and retrieve the $60,000.00 which was supposedly hidden in the chimney. Id. at 824.

Appellant had the gun and the beater bat with him. N.T.T. at 824. The third man had a plastic supermarket bag with "white clear" zip ties in it. Id. at 825-26. He also had long dish-washing gloves and a ski mask, both of which Appellant wore. Id. at 826.

The "plan" was to "get" Hugo while he was sleeping. N.T.T. at 827-28. Gato, however, knocked on the door and Hugo peeked out the window, saw the men, and shouted "police, police" in Spanish. Id. at 828. The three men entered the house, Gato kicked the bedroom door off its hinges, and the men raced into Hugo's bedroom. Id. at 829. Gato and Appellant tried to use zip ties to tie up Hugo's feet but Hugo kicked his feet into Gato's face. Gato punched Hugo in the face. Id. at 829-30. Cruz-Santiago was holding Hugo down while Appellant tried again to tie his feet. Id. at 830. Hugo managed to fight his way onto his feet from the bed and tried to grab Cruz-Santiago. Cruz-Santiago pushed Hugo onto the bed. Id. at 830, 832. At that point, Cruz-Santiago started screaming at Appellant to give him his car keys. He told Appellant: "I'm leaving, I don't belong here." Id. at 833. Appellant then pulled out the green and black gun, pointed it at Hugo who was sitting on the bed, and said,"this is for the pain my heart felt

---

[17]Appellant would later refer to the third man as "Gato" as they were making their way from the murder scene and back to the camper. N.T.T. at 825.

15

when you were F-ing my wife." Id. As Appellant would later tell Gato, he shot Hugo "en que late," or "in what beats" – the heart. Id. at 833, 835.

The three men fled Hugo's room and got into Cruz-Santiago's Chevy Corsica. N.T.T. at 834. Appellant drove. Id. Gato was screaming at Appellant about why he shot Hugo. Id. at 835. There had never been any mention of murder, and Cruz-Santiago did not know Appellant was going to shoot Hugo. Id. at 833-34.

The three men returned to Appellant's camper at the Harnish Farm. N.T.T. at 836. Gato walked into the camper, while Appellant headed off toward the red house with the handgun he had used to shoot Hugo. Id. Cruz-Santiago exited the back seat of his vehicle, removed his clothing,[18] threw it in the vicinity of the camper, jumped back into his car and fled.[19] Id. at 836-37. Cruz-Santiago called Appellant the next day to tell him never to talk to him again. Id. at 838. Appellant responded, "don't say nothing, I'm with the cops right now" and hung up. Id. at 839.

Maria Martinez-Godoy, Hugo's cousin, testified about the events that took place in the early morning hours of March 22, 2017. N.T.T. at 326. Hugo had arrived home around 10:00 p.m. when Maria and her boyfriend, Edwin Matilde Hernandez-Munoz, were upstairs in their bedroom. Id. Maria was awakened later by "the banging of doors." Id. She heard a loud voice that she recognized as belonging to Appellant.[20] Id.

---

[18]Cruz-Santiago had basketball shorts and a tank top on underneath his clothing. N.T.T. at 837.

[19]Appellant had left the keys in the ignition. N.T.T. at 836. Cruz-Santiago had to call his wife two to three times for directions to get home. Id. at 838.

[20]That night, Maria would tell Edwin, as well as Gilma Gomez and Everardo Hernandez-Garcia, that she recognized the voice as Appellant's. N.T.T. at 328-29, 357. She was "very nervous and very scared" of Appellant during the first police interview that took place 12 hours

16

at 327. Appellant was saying in Spanish: "[Y]ou're going to do what I'm telling you to do." Id. at 342, 345. Maria then heard a "lamenting sound from [her] cousin," Hugo. Id. at 330. She looked out her bedroom window and saw a white car. Id.

Too afraid to go downstairs, Maria called Hugo twice on his cell phone at 1:57 a.m. but got no answer. N.T.T. at 331-32, 346, 479. She then called Hugo's cousin, Jaime, and got no answer. Id. at 331-32. Finally, Maria got in touch with Hugo's uncle, Everardo, who told her to go downstairs. Id. at 332-33; see also Id. at 366. Maria and Edwin tried to enter Hugo's bedroom on the first floor through the door near the entry but it was locked. Id. at 338-39. After knocking very loudly on the door and calling out to Hugo and receiving no response, they decided to wait for the arrival of Hugo's uncle. Id. at 340-41. Maria determined that the intruders had entered the house through the front door which had no locking mechanism so a "tub of sand" was placed behind it. Id. at 337.

Everardo Hernandez-Garcia testified that he was called by Maria in the middle of the night to come to Hugo's home right away. N.T.T. at 369. He found his nephew laying on the bed on his back, with no pulse. Id. at 369-70. Everardo did not disturb the crime scene but went to the kitchen where the family members were gathered. Id. at 370. At 2:44 a.m., Gilma Gomez called 911. Id. at 370, 480. It was also then that Maria told him that the voice she heard downstairs was Appellant's. Id. In his interview

---

after the murder and did not mention at that time that the voice she heard belonged to Appellant. Id. at 328, 342. At the second police interview the next day, Maria did state that the voice she heard in the house the night of Hugo's murder was Appellant's. Id. at 329, 342-43. She also reported to the police that Hugo had told her that he was afraid of Appellant. Id. at 359.

17

with the police at the scene, Everardo stated that Appellant was jealous of the deceased because of his relationship with Appellant's wife, Patricia. Id. at 371.

After responding to the 911 call and discovering the body, the Pennsylvania State Police (PSP) called in forensic specialists. N.T.T. at 482. Master Trooper David Howanitz, from the PSP Lancaster Forensic Services Unit, surveyed the crime scene. Id. at 173. He determined that the perpetrators had entered the house through the front door which had no locking mechanism – no door handle lock and no deadbolt. Id. at 184; *see also* Id. at 509. The residents had placed a weight on the floor behind the door. Id. The assailants had simply pushed the door open and made a "straight line" from the front door through the bathroom to the door into Hugo's bedroom. Id. at 185-87. The bedroom door "received blunt force trauma" as evidenced by the top hinge being detached from the door frame. Id. at 187-88. The "trim molding [was] fractured" and the "hinges were actually ripped free" from the door frame. Id. at 187-88; *see also* Id. at 511. Part of the door frame was on the bathroom floor. Id. at 188.

There was evidence of a struggle in the bedroom. N.T.T. at 193-94. The victim appeared to have defensive wounds on his hands. Id. at 197. Zip ties were found on the floor and on the bed. Id. at 192-93, 196. Three zip ties were found on the victim's left hand but none on his right. Id. at 200-01; *see also* Id. at 159-60, 281; *see also* Commonwealth Exhibit No. 9. Zip ties were also found on the victim's right ankle. Id. at 208; *see also* Id. at 159-60, 281; *see also* Commonwealth Exhibit No. 7. All of the zip ties were identical in appearance, shape, size and color.[21] Id. at 209. Trooper

---

[21]An identical zip tie was found in the driveway outside the victim's home. N.T.T. at 203.

18

Howanitz also collected a "Speer 9 mm silver shell casing" from the bedroom and, ultimately, the spent munition (bullet) from the victim's body. Id. at 209; *see also* Commonwealth Exhibit Nos. 8 and 10.

The crime scene was also processed for DNA evidence. Blood was found in the "little closet vestibule" beyond the broken door frame and before the actual bedroom. N.T.T. at 190-91. This blood was later determined to be from an unknown male.[22] Id. at 190. As expected, Hugo's blood was found all over the bedroom. Id. at 245. No DNA was obtained from the zip ties retrieved from the bedroom. Id. at 229, 230. The fingerprint analysis did not yield any results as the only matches found were from Hugo. Id. at 215, 217. Six shoe impressions were cast but there were no matches with comparison footwear. Id. at 217-18, 223; *see also* Id. at 510-11.

Trooper Linda Gerow, the affiant in this case, testified that, while the scene was being processed, interviews were conducted of the six individuals that had gathered in the kitchen of Hugo's home – Maria Martinez-Godoy, Edwin Matilde Hernandez-Munoz, Gilma Gomez, Everardo Hernandez-Garcia, Eismary Enamorado and Jaime Lopez-Hernandez. N.T.T. at 484-85. These interviews all confirmed Appellant as a person of interest in the homicide. Id. at 484; *see also* Id. at 362, 371.

After receiving the statements from Hugo's family members, Trooper Gerow's concern was for Patricia and her son, and so Patricia was contacted and asked if she would agree to an interview. N.T.T. at 484. When Trooper Gerow arrived at Patricia's home on Center Avenue between 3:00 and 3:15 p.m. on the afternoon of March 22,

---

[22]DNA samples were taken from the victim, Appellant and Cruz-Santiago for comparison purposes. N.T.T. at 214-15.

2017, to her surprise, Appellant was there. Id. at 480, 483-84. Patricia had called Appellant and he had come over to the house. Id. at 484. At that time, Appellant agreed to go to the PSP barracks for a formal interview. Id. at 485.

Based upon the information received from Hugo's family and friends, Trooper Gerow questioned Appellant regarding the events that occurred at Hugo's home on Christmas Eve. Appellant admitted to being at the Pennsy Road property on Christmas Eve and "admitted that he had gone to the house . . . to confront [Hugo] about having an affair with his wife." N.T.T. at 487. Appellant was arrested following his interview on March 22, 2017, and charged with the crimes of burglary, firearms not to be carried without a license, two counts of terroristic threats, one count of endangering the welfare of children, four counts of simple assault, and four counts of recklessly endangering another person. Id. at 486-90.

Following his arrest on March 22, 2017, for the Christmas Eve incident, Appellant's cell phone was seized. N.T.T. at 496; see also Commonwealth Exhibit No. 19 (search warrant). A phone extraction revealed 27 calls from Appellant to the same number in the period immediately surrounding the homicide. Id. at 503. The number was ultimately traced to Cruz-Santiago, and he became a person of interest in the investigation. Id. at 503-04. His phone records were then also seized. Id. at 499; see also Commonwealth Exhibit No. 21.

In the early morning of March 22, 2017, just hours after the murder of Hugo and before the interview and arrest of Appellant for the Christmas Eve incident, Jeffrey Johns reported for work at the Harnish Farm and found a pair of jeans and a shirt "spotted with blood" at the "red Autocar dump truck." N.T.T. at 450. Johns did not

20

touch the clothing and it remained where he found it until the police arrived thirty minutes later to secure the scene. Id. at 451-52.

Pursuant to a valid search warrant for the Harnish Farm executed on March 23, 2017, the PSP seized the bloody shirt and jeans. N.T.T. at 233-34, 495; *see also* Commonwealth Exhibit No. 16 (white shirt with suspected bloodstains) & No. 17 (blue jeans with suspected bloodstains). Trooper Howanitz testified that he found Hugo's blood on one of those items of clothing found at the Harnish Farm. Id. at 245. Additionally, an unknown male's blood was also found on the clothing. Id. at 246.

Trooper Howanitz also searched Appellant's camper at the Harnish Farm in West Lampeter Township. N.T.T. at 231. In the sink was a zip tie identical in size, shape, color, and design construction as the ones he recovered from the crime scene. Id. at 240-42, 495; *see also* Commonwealth Exhibit No. 18. A general search of the camper and farm for the murder weapon was conducted on March 23, 2017, which was unsuccessful. Id. at 536.

After waiving his **Miranda** rights, Appellant participated in a second interview with Trooper Gerow on March 23, 2017, that lasted three-and-one-half hours. N.T.T. at 547, 552; *see also* Commonwealth Exhibit No. 34 (warning and waiver form). Trooper Torres and a Spanish-speaking sergeant then interviewed him for an additional amount of time. Id. at 553. Throughout the interview, Appellant was "[u]nusually calm" and "very subdued." Id.

Appellant explained to Trooper Gerow that he met Patricia, his third wife, in El Salvador, and that they had been married for just three years but together for nine

21

years. N.T.T. at 549. He stated that he met the victim, Hugo, when Hugo emigrated to the United States in 2007 or 2008. Id. at 550. Appellant remarked that they were "all very good friends." Id.

In the summer of 2016, Appellant started fighting with his wife about her working outside the home. N.T.T. at 559-60. Patricia was questioning Appellant about his money and so he canceled her debit/credit card. Id. at 578. When Patricia no longer had a debit/credit card, she would take money from Appellant's wallet. Id. at 578-79. Appellant said Patricia also wanted to learn how to drive, and was pulling away from him. Id. at 594-95. He said he caught Patricia lying to him. Id. at 596. Appellant stated that he does not trust anyone, not even his own mother. Id. As a result of Patricia's behavior, Appellant left the marital home on Center Avenue and moved into a trailer in the summer of 2016. Id. at 558.

Appellant first stated that he suspected Hugo of "fooling around with his wife" and confronted Hugo about his relationship with Patricia on multiple occasions. N.T.T. at 550-51. Appellant later denied ever thinking something was happening between Patricia and Hugo. Id. at 573. He stated that, because his wife kicked him out of their house, he suspected that she had a boyfriend and was cheating on him but he did not believe it was with Hugo. Id. at 551, 574.

On New Year's Eve 2016, Appellant said he went over to Patricia's house to do laundry, to do the dishes, and to clean. N.T.T. at 566. Patricia told Appellant he was "too old and boring" for her and Patricia left the house with their son, Lucas, shortly after he arrived. Id. at 563-64, 566. Appellant admitted showing up at Jaime's house later that evening, confronting Hugo in the basement, and inviting him to "go outside."

22

N.T.T. at 570-71, 580. He claimed that Hugo denied "fooling around" with Patricia or having any interest in her. Id. at 571, 581.

When questioned regarding his whereabouts on the night of the murder, Appellant said he arrived at Patricia's house around 4:00 p.m. on March 21, 2017, to look after their son. N.T.T. at 551, 588. He stayed at the house with his son until 9:30 p.m. when Patricia returned from work. Id. Patricia changed her clothes, and she and Lucas then left to have dinner with Jaime and Eismary Enamorado. Id. at 588, 590. Appellant called Patricia around 11:00 p.m. and asked her when she would be coming home because it was a school night for Lucas.[23] Id. at 590. Patricia told Appellant to go home and go to sleep, as she would be on her way home soon. Id.

Appellant stated he left Patricia's house in Manheim Township, stopped for diesel fuel at the Turkey Hill convenience store in Bridgeport, just outside the City of Lancaster, and went straight to his camper. N.T.T. at 551-52, 909. Appellant told the police he spoke to Patricia at 11:20 p.m. and then went right to bed and slept until 4:30 a.m. when his alarm went off. Id. at 591, 909. He worked a half-day putting in fencing around the incinerator in Harrisburg, and then went to Patricia's house on Center Avenue between 3:00 and 3:30 p.m. on March 22, 2017. Id. at 591. Appellant denied ever leaving his camper after arriving home around 10:00 p.m. on the evening of March 21, 2017, and denied all knowledge of the murder of Hugo. Id. at 551-52, 554.

---

[23]Eismary Enamorado told the police that Patricia came over for dinner on the evening of March 21, 2017, at approximately 9:30 p.m., and that Appellant called asking if Hugo was there and when Patricia would be returning home. N.T.T. at 408-10.

Appellant noted that he was a Marine in El Salvador and although he owned a .44 magnum in his country, he denied having any guns here.[24]  N.T.T. at 552, 584-85. Appellant further shared that he was divorced three times because each wife had cheated on him – one in El Salvador, one in New York, and one in Lancaster.  Id. at 557.  He admitted that he was not "lucky with women" and further stated: "when I get mad, I get mad."  Id. at 576.

In his interview with Trooper Gerow on March 23, 2017, Appellant never once mentioned Cruz-Santiago's name, despite the fact that there were 27 calls between them the night before the murder, and 161 calls in the two weeks before the murder. N.T.T. at 556.  Appellant said nothing to the police on March 23, 2017, about Cruz-Santiago and two others borrowing his truck, coming back with a gun, and demanding a change of clothing, as Appellant would later allege.  Id. at 553-54.

Because of Appellant's reference to getting fuel at the Turkey Hill in Bridgeport on the way home from Patricia's house in Manheim Township on the evening of March 21, 2017, Trooper Gerow obtained surveillance videos in the Bridgeport area.  N.T.T. at 501-02.  The video from a Sunoco station across the street from the Turkey Hill showed Appellant's crew cab pick-up truck and Cruz-Santiago's light grey Chevrolet Corsica at the Sunoco at approximately 11:30 p.m.  Id. at 504, 598-99, 601-02.  Both vehicles left the Sunoco lot.  Id. at 603-04.  Appellant parked his vehicle on a side road.  Id. at 604. Cruz-Santiago's vehicle was then observed turning off the side street and onto the main road.  Id.  Twenty minutes later, Cruz-Santiago's car came back and turned down the

_____

[24]Jeffrey Johns testified that Appellant sold him a .44 magnum in the summer of 2016. N.T.T. at 461-62.

24

side road where Appellant's truck was parked. Id. Cruz-Santiago parked his car and two minutes later Appellant's truck was seen driving down the side street and turning onto the main road, with Cruz-Santiago's car behind it. Id.

This Sunoco surveillance video from March 21, 2017, showed Appellant out from 11:27 to 11:55 p.m. – the time when Appellant told Trooper Gerow he received a call from Patricia at home (11:20 p.m.), went to bed and never left the camper again. N.T.T. at 604-05. Appellant had lied to the police. The surveillance video, the bloody clothing found at the Harnish Farm, the zip tie found in Appellant's camper, and the statements of several witnesses gave the Police sufficient probable cause to charge Appellant on April 3, 2017, with the homicide of Hugo.[25] Id. at 492-93, 495, 502-03.

Appellant's phone records and the Sunoco surveillance video pointed to Cruz-Santiago as a person of interest in this case. On April 5, 2017, Cruz-Santiago was acting as a confidential informant for the Lancaster City Bureau of Police and was scheduled to meet with his contact at the Bureau.[26] N.T.T. at 857, 859-60. Trooper Gerow also showed up at that meeting and told Cruz-Santiago she was investigating a death. Id. at 861. Cruz-Santiago initially denied knowing Appellant and anyone named Hugo. Id. at 783, 861-62. His phone, however, showed Appellant's number under his street name, "El Chapo." Id. at 782-83, 862. At that point, Cruz-Santiago admitted to

---

[25]The conspiracy charge would be added later after Trooper Gerow's interview with Cruz-Santiago on April 5, 2017. N.T.T. at 505.

[26]Cruz-Santiago had reported to his parole officer in March of 2017, and was arrested and charged with delivery of heroin for an incident in September of 2016. N.T.T. at 857, 859-60. Cruz-Santiago agreed to act as a confidential informant for the Lancaster City Police and his bail was set at $25,000.00 unsecured. Id. at 858, 860.

25

knowing Appellant. Id. at 780-81. Cruz-Santiago told Trooper Gerow that Appellant had offered him work putting up fences on his days off from his restaurant job, and that they became buddies. Id. at 782-83. Cruz-Santiago denied knowing anything about a murder. Id. at 876. He testified at trial that he said nothing about the murder in this first conversation because he was "scared" and "didn't want to be involved."[27] Id. at 783. This initial interview with Trooper Gerow on April 5, 2017, lasted approximately five-and-one-half hours. Id. at 876.

At the conclusion of the interview, it was determined that Cruz-Santiago could no longer serve as a confidential informant for the City Police based on his new status as a person of interest in a homicide. N.T.T. at 876-77. Consequently, Cruz-Santiago was taken into custody on the new drug charge, and transported to the Lancaster County Courthouse for a bail reassessment hearing, where his bail was increased to $500,000.00. Id. at 784, 878. Trooper Gerow then transported Cruz-Santiago to LCP, and immediately upon entering the Prison, Cruz-Santiago offered additional information and indicated that he was prepared "to tell the truth" because he was scared Appellant would be released from prison and attack Cruz-Santiago's family. Id. at 785, 878.

Trooper Gerow immediately transported Cruz-Santiago to the PSP barracks and during a three-and-one-half-hour interview, Cruz-Santiago admitted his involvement in Hugo's murder. N.T.T. at 785-86. He also told Trooper Gerow where his bloody

---

[27]One week after the murder, someone walked up to Cruz-Santiago and said, "if I was you, I'd keep my F-ing mouth shut." N.T.T. at 839. Two days before he was arrested on April 5, 2017, a person approached him in Elizabethtown and said, "if you testify – if you say anything, we will beat you." Id. at 778.

26

clothes were.[28]  Id. at 812.  Cruz-Santiago further detailed Appellant's planning and execution of Hugo's murder.  Id. at 786.  Cruz-Santiago was arrested on April 5, 2017, and charged with criminal homicide, burglary and two counts of conspiracy.  Id. at 529.  Cruz-Santiago met with Trooper Gerow additional times "to finish saying the truth and put it together."  Id. at 786-87.

In the months following the arrest of Appellant and Cruz-Santiago for the murder of Hugo, four prisoners at LCP approached the District Attorney's Office with information relative to this case.  See N.T.T. at 546.  Each prisoner testified for the Commonwealth in this case.[29]  There were no promises, no deals, no discussions with the witnesses regarding their pending charges, and no participation in the prosecution of their cases by the assistant district attorney handling Appellant's case.  Id. at 546; see also Id. at 653-64, 707, 734.

Jesus Eduardo Ramirez-Granados, a prisoner facing two burglary charges, met Appellant on April 23, 2017, when they entered intake together at LCP.  N.T.T. at 653, 655.  They were housed together for two-and-one-half weeks.  Id. at 656.  While cell mates, Appellant told Jesus about the confrontation with Hugo at a Christmas party because Hugo was having an affair with his wife.[30]  Id. at 656-57.  Appellant never

---

[28]Cruz-Santiago was unaware that the police had already found his bloody clothing, or the Sunoco surveillance video showing him in those clothes. N.T.T. at 874; see also Id. at 233-34, 495.

[29]Charles Stevens, a criminal investigator with LCP, testified that three of the four prisoners, Jesus Eduardo Ramirez-Granados, Jose Luis Felix-Deleon, and David Matthew Malin, were all housed with Appellant while at LCP. N.T.T. at 756-57.

[30]The evidence established that the confrontation on Christmas Eve between Appellant and Hugo did not occur at a party, but rather at Hugo's home while he and others were getting ready to go to church. N.T.T. at 313-24. There was a second confrontation with Hugo at a New Year's Eve party in the City of Lancaster a week later. Id. at 373-79, 400-07.

27

mentioned a gun, however. Id. at 658. Appellant told Jesus his son had an iPhone and he discovered details of the cheating on the phone. Id. at 658. Appellant described for Jesus the events of March 22, 2017:

> [H]im and two other guys went to a house to grip up – to rob a guy. And the guys that went to go tie Hugo, they tied him up. And the only thing that happened was that the guy [Hugo] was stronger than the other two guys. . . . Hugo was stronger than the two guys that were trying to tie him up. . . . And [Appellant] didn't know how to react, so . . . [Appellant] told me that he shot him in the chest.

Id. at 659. Appellant admitted shooting Hugo in the chest. Id. at 660. Appellant said he met these two people at a Sunoco gas station. Id. at 660. He said the original plan was to tie the guy up and rob him and scare him. Id. Appellant told Jesus he took the clothes to destroy them and "dismantled" the gun but Appellant did not say where the gun was. Id. at 662. Appellant offered Jesus a job upon his release from prison. Id.

Jesus was later housed with Cruz-Santiago, whom he knew by his nickname "Skillet." N.T.T. at 663-64. Jesus initiated a conversation with Cruz-Santiago about this incident and Cruz-Santiago's facts were consistent with Appellant's. Id. at 665-66, 678. Jesus first told Cruz-Santiago that Appellant told him he shot Hugo in the chest. Id. at 677. Cruz-Santiago did not deny being at the scene, only pulling the trigger. Id. at 678. Cruz-Santiago told Jesus he had a wife and baby on the way and that he did not want to face life in prison for something he did not do. Id. at 677. Cruz-Santiago asked Jesus to talk to his lawyer about what Jesus had learned from Appellant. Id.

Appellant confessed to Jesus that he shot Hugo in the chest "in a tie-up robbery that went bad." N.T.T. at 666. Jesus came forward because he "wanted to bring justice

28

to the case because I felt like it was the only right. And then I was hoping that something can benefit me out of the situation." Id. at 667; *see also* 675-76.

Although Jesus read Appellant's criminal complaint and affidavit of probable cause in this case, as well as some of Cruz-Santiago's paperwork, N.T.T. at 671-72, Trooper Gerow testified that none of these documents contained information regarding Hugo being shot by Appellant, a party of any sort, or the assertion that robbing the victim was part of the plan. Id. at 759-60.

A second prisoner, Jose Luis Felix-Deleon, reached out to investigators in the middle of November 2017 regarding the recovery of a 9 millimeter handgun in a murder case . N.T.T. at 685-87. Jose was Appellant's cell mate at LCP in the beginning of November 2017. Id. at 686-87. Appellant knew Jose's brother who had been incarcerated before Jose. Id. at 688. Appellant sought Jose's advice about his case and showed him some paperwork. Id. Jose also looked at the paperwork when Appellant was out of the cell. Id. at 688-89.

Appellant told Jose that Hugo was "sleeping" with his wife. N.T.T. at 689. Appellant never said he shot Hugo. Id. at 689. However, because Appellant thought Jose would be getting out of prison soon on bail, he asked Jose to do a job for him – "[t]o recover the weapon, a gun." Id. at 690. Appellant said the gun was on a property he was renting where he parked his camper, and that the gun was sitting under a pile of tires. Id. at 691, 698. Appellant said sometime after the murder he heard sirens driving by the main road and "got scared and he went and hid the gun." Id. at 705. Appellant asked him to get the gun and destroy it. Id.

Jose had never met Appellant before and had never been to his property so Appellant made a drawing, "a little paper map." N.T.T. at 691, 701, 704. After reviewing the map with Jose, Appellant flushed it down the toilet. Id. at 704, 714. Jose was able to recreate the map from memory during his interview with investigators on December 19, 2017. Id. at 701-02; *see also* Commonwealth Exhibit No. 25. This map had street names, business locations, and traffic lights on it. Id. at 702. Also on the map was depicted a small red truck and a pile of tires and wood pallets. Id. at 703. Appellant further directed Jose to call his wife, Patricia, once he found the gun. Id. at 702-03. Jose never got released from LCP so he never went to the farm. Id. at 699.

Appellant described the gun to Jose as a "small military gun," "Army green," and "9 millimeter." N.T.T. at 692. Appellant warned Jose to be careful when retrieving the gun because there was a bullet in it. Id. He told Jose "[t]o destroy the gun in a local park and hide it in the park or throw it in the river" and offered him "a sum of $10,000 with $3,000 up front," which he said he could get from a family member. Id. at 692-93, 698. Appellant discussed this proposal with Jose twice a week for two weeks, with the offer becoming "stronger" as Appellant became more trustful and confident in Jose. Id. at 693.

While leaving a bible study at the prison, Appellant pointed out another prisoner, Cruz-Santiago, and told Jose, "he was going to screw him over." N.T.T. at 694. Over the course of several days, Appellant told Jose more details about the murder. He told Jose he met Cruz-Santiago at a Sunoco near a Weis Market and they went for a drive in Cruz-Santiago's car. Id. at 695–96. Appellant said there were three people involved in the murder. Id. at 697. Appellant referred to an incident at Christmas when he

30

confronted Hugo, and his wife and child were there too. Id. "He was upset with them. He removed a gun and he threatened them, saying that if they were in El Salvador, they would not be alive now, that he told them that." Id.

Jose Felix-Deleon has since been convicted and received a state sentence of two to five years' incarceration, without any consideration from the Commonwealth for his testimony in this case. N.T.T. at 683, 706, 710. Trooper Gerow noted that several of the details testified to by Jose were not contained in any criminal complaints or affidavits of probable cause or even in the discovery, such as the proximity of a Sunoco station to a Weis Market, the caliber of the round that killed Hugo, the reference to a farm or tires, the words allegedly spoken by Appellant to Hugo that "if you were in El Salvador, you'd be dead already," or any maps. Id. at 698, 760-61.

The next former LCP prisoner to testify for the Commonwealth was David Matthew Malin.[31] David reached out to law enforcement after being housed with Appellant from January to April 2018. N.T.T. at 719. While cell mates, Appellant discussed Hugo's murder, although over the several weeks they lived together, Appellant would tell David "a number of different versions" of the story. Id. at 722.

Initially, Appellant denied all involvement in the murder and blamed Cruz-Santiago. N.T.T. at 720. Appellant said three people were involved in the murder. Id. Appellant first told David that Cruz-Santiago stole Appellant's gun from his truck. Id. at 721. Then he said he was home the night of the murder and that Cruz-Santiago "busted through his door and [Cruz-Santiago] took the gun from him." Id. at 723.

_____

[31]David is not presently incarcerated and is not facing any open charges, although he has a long criminal history. N.T.T. at 717-18.

31

Appellant said "the other two guys restrained [Hugo] and that . . . [Cruz-Santiago] was being alleged to have gone and shot the guy." Id. Appellant told David that Cruz-Santiago arrived at his camper in a "frantic" state and "asked if he could shower and that [Appellant] told him no, but he was already taking his clothes off. And so he picked up the clothes and he picked up the gun on the way out. Cruz ran out the door. He picked up the gun with the clothes and threw it out the door." Id.

Then Appellant's story changed. David testified that "[Appellant] had a dream and he was really, like, he was a mess" when he woke up. N.T.T. at 724. Appellant told David "the victim's family were doing Santeria[32] to attack his spirit or to attack him through his spirit and that he saw the victim tied up with zip ties and laid up against the wall. And he was crying. . . ." Id. "It was weird." Id. David tried to calm Appellant by telling him he would not get charged with the murder if the police did not have the gun. Id. at 725.

Appellant told David the gun "definitely had his fingerprints on it" because he picked it up and handled it, after the other three men stole the gun and then left it at his camper. N.T.T. at 735-36. Appellant asked David to go get the gun that Appellant said was "outside of his trailer . . . in a pile of tires . . . [n]ext to a pile of wood." Id. at 725-26, 733. Appellant directed David "to go there on a Sunday" but "to call his wife first." Id. at 726. David testified that Appellant gave him his wife Patricia's cell phone number

> [a]nd I was supposed to call her when I got out and ask her to go
> with me to the farm and ask her to keep watch because I was

---

[32]Santeria is a pantheistic Afro-Cuban religious cult developed from the beliefs and customs of the Yoruba people in which Yoruba deities are identified with Roman Catholic saints. See Merriam-Webster Dictionary.

32

helping Jose. I wasn't supposed to tell her what I was helping with, but I was supposed to tell her just to keep watch. And I was supposed to get the gun and take it and get rid of it. And then I was supposed to call Patricia, give her my number, put money on my phone so he would call me and I could either say I don't like the trailer, which means I don't find the gun, or I do like the trailer, which means I found the gun.

Id. Appellant offered David the trailer, purportedly worth "$30,000." Id. Appellant wrote Patricia's cell phone number in David's LCP address book.[33] Id. at 727-29; *see also* Commonwealth Exhibit No. 26-A (address book) & No. 26-B (original page removed from the address book with Patricia's number in Appellant's handwriting).

Prior to his incarceration, David had never met Appellant, or his wife, and had never been near Appellant's camper. N.T.T. at 729. So Appellant drew a map to where the gun was hidden on the Harnish Farm. Id. at 731. He shared the map with David and then threw it in the toilet. Id. David was able to recreate the map from memory during his interview with the Commonwealth. Id. at 731-32; *see also* Commonwealth Exhibit No. 26-C. The map showed "[t]he trailer and the pile of wood with a red truck on the right side and a pile of tires on the left side." Id. at 732. Appellant said the gun was hidden in the tires. Id. at 733.

Appellant also told David the victim in this case and his wife were sleeping together. N.T.T. at 724. David testified that Appellant's version of the events that Cruz-Santiago committed the murder did not make sense. "And the more that he did say and the more the stories changed, the more it made [David] feel like [Appellant] did it." Id. at 744.

---

[33]Officer Stephen Owens of the Lancaster City Bureau of Police later testified that the phone number in prisoner David Malin's address book did, in fact, belong to Appellant's wife, Patricia. N.T.T. at 945; *see also* Id. at 932.

Again, Trooper Gerow testified that several of the details told by David Malin were not contained in any criminal complaints or affidavits of probable cause or even in the discovery, such as the reference to a farm or tires, any maps, or Patricia's cell phone number. N.T.T. at 760-61. In fact, Patricia's number had been changed after the murder and the new number was the one in David's address book. Id. at 761-62.

The final prisoner to testify for the Commonwealth was Luis Alberto Rodriguez, Jr.[34] Luis met Appellant on the drug and alcohol block at LCP. N.T.T. at 747. Luis only had contact with Appellant twice. Id. at 748. Appellant wanted Luis to contact Appellant's attorney and tell him that he "used to work with him, that he was a good gentleman, a religious person, [and] a man of God." Id. Appellant wanted Luis to tell Appellant's attorney that he knew Cruz-Santiago from the streets and that "he was a junkie, drug user, and just basically a no-good person."[35] Id. at 749. Basically, Appellant wanted Luis to lie for him. Id. at 749-50.

Luis refused to help Appellant. Luis eventually got time served on his parole violation and was released from LCP. N.T.T. at 750. He was picked up two weeks before the trial in this matter on another parole violation and met Cruz-Santiago in LCP for the first time. Id. "Everything clicked in my head. . . . [T]hat was the dude that [Appellant] was talking to me about. So I just told [Cruz-Santiago] what [Appellant] was just trying to do, . . . trying to get people to testify to these things about him." Id.

---

[34]At the time of trial, Luis was sitting in LCP on open charges. N.T.T. at 746.

[35]Luis only knew of Cruz-Santiago by his street names, "Skillet" and "Puerto Rico." N.T.T. at 749.

As a result of the information received from Jose Felix-Deleon and David Malin, Trooper Gerow returned to the Harnish Farm in December 2017 to search for the murder weapon in a pile of tires.  N.T.T. at 538, 541.  A photograph of the area around Appellant's camper taken in March 2017 confirmed the presence of a pile of tires and debris.  Id. at 539-40.  In December, however, the tires were gone and Trooper Gerow was informed that they had been moved in May 2017.  Id. at 541.  No weapon was ever found in this case.  Id. at 212.

Jeffrey Johns, an employee at the Harnish Farm, testified that, approximately two months after the murder, he was told by Trooper Gerow that the investigation there was complete, and so he proceeded to clean up an area of debris near where Appellant's camper had been.  N.T.T. at 454-55.  A pile of tires, plastic, concrete slabs, and scrap was loaded in a dump truck and taken to the landfill.  Id. at 455-56.  The area was then planted with grass and "turned back to virgin ground."  Id. at 456.

The final witness for the Commonwealth was Stephen Owens, an expert in cellular telephone records analysis with the Lancaster City Bureau of Police.  N.T.T. at 879-80.  Officer Owens also works with the PSP Electronic Surveillance Unit and is assigned to the FBI's Capital Cities Violent Crime Task Force.  Id. at 881.

Officer Owens tracked the T-Mobile phone records for Appellant, Cruz-Santiago, Hugo, and Patricia from two different tower locations.  N.T.T. at 883, 887, 888, 930; *see also* Commonwealth Exhibit No. 35 (cell records).  These records confirmed that Cruz-Santiago never had phone contact with Appellant prior to March 10 or 11, 2017, but he communicated with Appellant 161 times between March 11, 2017, and March 22, 2017, and 32 times between March 21, 2017, and March 22, 2017.  Id. at 884, 925-28.  The

data also showed that Cruz-Santiago never had any phone contact with Hugo. Id. at 884. The T-Mobile phone records further established that between December 23, 2016, and March 21, 2017, Patricia and Hugo communicated with each other 996 times. Id. at 930.

Officer Owens first testified that on Christmas Eve 2016, Appellant called Patricia at 6:19 p.m. N.T.T. at 922. At 6:42 p.m., the data showed Appellant moving towards Hugo's residence. Id. This evidence is consistent with the testimony by several witnesses regarding Appellant's confrontation with Hugo at his home on Christmas Eve.

Officer Owens next laid out the series of phone calls between the parties on the night before the murder and the early morning hours of the murder. Appellant called Cruz-Santiago at 3:50 p.m. on March 21, 2017. N.T.T. at 896. Cruz-Santiago was near his home in Elizabethtown and Appellant was near Patricia's residence when the call was placed. Id. at 896-97. This evidence is consistent with Appellant's statement that he was at Patricia's house in Manheim Township at approximately 4:00 p.m. the day before the murder. Id. at 897.

Between 9:28 and 10:30 p.m., Cruz-Santiago left Elizabethtown and drove to Lancaster City. N.T.T. at 901. At 10:30 p.m. Appellant made a call to Cruz-Santiago. At that time, Appellant was southeast of the City, and Cruz-Santiago was in the City. Id. at 903-04. A license plate reader mounted on the back of a Lancaster City Police vehicle recorded Appellant's truck heading south on Lampeter Road away from Bridgeport at 10:56 p.m. on March 21, 2017. Id. at 905-06. This plate read is consistent with Appellant's story of stopping in Bridgeport at the Turkey Hill to get fuel on his way home from Patricia's house. Id. at 909. At 10:56 p.m. Appellant's phone

36

made a call to Cruz-Santiago's phone from the same area identified by the license plate reader. Id. at 907-08. Officer Owens testified that this information confirmed that Appellant had his phone with him in his truck. Id. at 908.

At 11:07 p.m. Appellant called Cruz-Santiago from a location well south of Appellant's residence and in an area consistent with Hugo's residence. N.T.T. at 910, 912. Appellant was traveling north as he called Cruz-Santiago, who was still in the same location in the City. Id. at 911-12.

At 11:27 p.m., Cruz-Santiago called Appellant from near the Sunoco in Bridgeport. N.T.T. at 913. Officer Owens testified that he had a "high confidence level that both of those phones [were] at the Sunoco based on the video evidence[,] . . . the statements from [Cruz-Santiago], and the cell phone records that are there." Id. at 942. Thus, it was his expert opinion that Appellant and Cruz-Santiago were together at the Sunoco in Bridgeport at 11:27 p.m. Id. Appellant was clearly not at his trailer, as he had told his wife he was in a phone call at 11:20 p.m. Id. Again, Officer Owens was confident that when Appellant said that he was home, he "absolutely [was] not. He's not at home. That one I would say a hundred percent." Id.

Officer Owens testified that Appellant next called Cruz-Santiago at 1:00 a.m. and again at 1:05 a.m. N.T.T. at 915. The evidence established that the two men were not together in the same vehicle but rather Cruz-Santiago was following Appellant at this time. Id. The phones were in the Willow Street area. Id. at 916-17.

Officer Owens testified that there was "[n]ot a lot of activity at all until 2:04 in the morning when Cruz-Santiago calls [Appellant]." N.T.T. at 917. This call was made somewhere west of the murder scene. Id. at 917-18. This is consistent with Cruz-

37

Santiago's testimony that he was lost after leaving Appellant's camper and was calling for directions. Id. at 918. By 3:04 a.m. Cruz-Santiago had made his way to the west side of Lancaster City and called his wife. Id. There was no further activity on Cruz-Santiago's phone until 9:34 a.m. on March 22, 2017. Id. at 918.

Appellant's phone was in the Harrisburg area at 6:03 a.m. on the morning of March 22, 2017. N.T.T. at 918. Appellant had received a call from Patricia at 5:46 a.m., and at 6:03 a.m. Appellant called her back. Id. at 919.

In his defense, Appellant took the stand at trial. Appellant explained for the jury that he had married his wife, Patricia, in 2005 but in 2016 they started experiencing marital problems.[36] N.T.T. at 952. Appellant was upset with his wife because she was staying out late at night with friends, she started working outside the home, and she was spending too much money. Id. at 952-53, 980-81. Patricia eventually "kicked [him] out" of the marital home and he went to live in a camper. Id. at 953, 981.

Appellant denied ever suspecting Hugo of being involved with his wife. N.T.T. at 953. However, he did admit to being upset with Hugo because he spent so much time with his wife. Id. at 953-54. Appellant further admitted showing up at Hugo's house on Christmas Eve but denied threatening anyone with a gun.[37] Id. at 957. Although originally stating he never believed Hugo and his wife were involved, Appellant did admit to confronting Hugo on New Year's Eve about Hugo's relationship with his wife. Id. at 957; see also Id. at 982.

---

[36]This testimony was inconsistent with his statement to the police in March 2017 that he and Patricia had been married for just three years but together for nine years. N.T.T. at 549.

[37]Appellant denied ever possessing a gun in this country. N.T.T. at 982-83.

Appellant detailed for the jury the events on the evening before the murder. He stated that he worked that day and got back to Lancaster and to Patricia's house between 3:00 and 3:30 p.m. to get their son off the bus. N.T.T. at 960-62. Appellant testified that he left Patricia's house anywhere between 9:30 and 10:30 p.m., and went to his trailer. Id. at 962, 964. He stated it can take 25 or 45 minutes to drive from Patricia's home in Manheim Township to his trailer in West Lampeter Township. Id. at 964.

After arriving home and reading his bible, Appellant stated he left his camper and drove to the Sunoco station in Bridgeport for fuel at 11:30 p.m. N.T.T. at 964-65. Appellant stated that Cruz-Santiago called him and requested that they meet at the Turkey Hill in Bridgeport so Cruz-Santiago could borrow Appellant's truck. Id. at 965-66. Appellant was on the phone giving Cruz-Santiago directions to Bridgeport as Cruz-Santiago drove because he was unfamiliar with the area. Id. at 966. After meeting up with Cruz-Santiago at the gas station, they drove across the street to a large market. Id. Appellant parked his truck and got into the driver's seat of Cruz-Santiago's car, where they sat and chatted for 20 minutes. Id. at 966-67. Cruz-Santiago told Appellant his name was Carlos and then proceeded to drink two beers. Id. at 967. Appellant exited the car, got into his truck and proceeded down Lampeter Road towards his camper, with Cruz-Santiago following him. Id. at 967-68.

Appellant testified that he stopped at a friend's house somewhere between his camper and Hugo's house. N.T.T. at 968. Appellant wanted his friend, Carlos, also known as "El Chato" to drive one of his trucks to work the next day. Id. Noone answered the door when Appellant knocked. Id. Appellant stated he then drove into

39

Lancaster "to look for a guy" to drive his truck "[b]ut unfortunately no one was there either." Id. at 969. Appellant returned to his camper between 12:30 and 1:00 a.m. Id.

At approximately 2:30 a.m., Cruz-Santiago knocked on Appellant's door. N.T.T. at 970. When Appellant opened the door, Cruz-Santiago had a gun in his hands and demanded Appellant give him some clothes. Id. at 970. Appellant gave him pants and a shirt. Id. Appellant then asked Cruz-Santiago what he had done, and he said: "I love to go and rob Mexican houses because they do not have papers. And I can go and deposit the money at the bank because they have it in cash in their house." Id. Appellant continued:

> [H]e went to the house, he had tied up a Mexican, and he had asked him where he had the money, that he needed the money.
> And the person was already tied up and was not answering back. And he said that he knocked him on the face and on the nose. That's why he was covered in blood, he said.
> And then he said he looked around in the house, the bedroom. And he wanted to steal whatever he could find, gold or money.
> And when he turned around, he saw that the Mexican was getting untied. And that's when he shot at him.

Id. at 970-71.

Appellant testified that, while Cruz-Santiago was talking to him, Appellant was trying to make his way out of the camper; he "just wanted to run away." N.T.T. at 971. When he looked outside his door, Appellant saw Cruz-Santiago's car parked next to his truck. Id. There were two men there – one sitting in the back seat and one standing at the driver's door. Id. at 971-72. The men did not look at him. Id. at 972. One man called to Cruz-Santiago that they need to go and Cruz-Santiago exited the camper. Id.

When Appellant turned back and looked in the camper, he saw bloody pants and a shirt that Cruz-Santiago had thrown on the floor. N.T.T. at 973, 992-93. Appellant

40

picked up the clothes and told Cruz-Santiago to take them. Id. When he returned for the clothing, Cruz-Santiago told Appellant that if he said anything to the police, Cruz-Santiago would say that Appellant had committed the crime. Id. At that time, Cruz-Santiago told Appellant he was part of a gang known as the Latin Kings and that his street name was "Puerto Rico." Id.

Appellant ordered Cruz-Santiago off the property, shut his door, and turned the light off. N.T.T. at 973. He eventually went to sleep and woke up with his alarm at 4:30 a.m. Id. at 974. After working half a day, Appellant returned to Lancaster and went to Patricia's house. Id. Patricia told him about Hugo's death and that the police were investigating all of Hugo's friends. Id. When he turned around at Patricia's door, the police were arriving. Id. at 975. Appellant was taken to the PSP barracks and interrogated. Id. Appellant admitted lying to the police initially because he was afraid of Cruz-Santiago. He stated: "I did not say exactly what had happened. I denied everything." Id. at 975.

On cross examination, Appellant explained that he drew maps to his camper for Jose Felix-Deleon and David Malin, and then flushed them down the toilet, because they wanted to buy his camper. N.T.T. at 984-85. Appellant denied being friends with Cruz-Santiago, and said Cruz-Santiago merely wanted to work for Appellant. Id. at 989. He stated that the 156 calls with Cruz-Santiago over an 11-day period in March 2017 were all about work. Id. at 989-90. Appellant then insisted that Cruz-Santiago had been to his camper on two occasions in January 2017 and that they had spoken by phone many times between January and March, despite the fact that the T-Mobile

41

phone records from as early as September 2016 show no calls between these two men until March 2017. Id. at 990-91.

Appellant presented no other evidence beyond his testimony.

### A. Sufficiency of the Evidence

#### 1. First-Degree Murder

Although Appellant purports to challenge the sufficiency of the evidence for the murder conviction, in fact, his argument challenges credibility, chiefly that of the Commonwealth's primary witness, Cruz-Santiago. *See* Second Amended Concise Statement at ¶ 3(A). Specifically, Appellant claims the testimony of Cruz-Santiago placing him at the scene of the murder and attributing to him the specific intent to kill was not sufficient because it was "unreliable [and] contradictory." Id.

Our Supreme Court has determined that a challenge that the testimony of a witness was not credible implicates the weight, rather than the sufficiency, of the evidence. *See* **Commonwealth v. Montalvo**, 598 Pa. 263, 273 n.6, 956 A.2d 926, 932 n.6 (2008) (holding that a claim that the evidence is insufficient because the witness was not credible "challenges the weight, and not the sufficiency, of the evidence."). *See also* **Commonwealth v. Palo**, 24 A.3d 1050, 1055 (Pa. Super. 2011) ("Directed entirely to the credibility of the Commonwealth's chief witness, Appellant's claim challenges the weight, not the sufficiency, of the evidence.").

Nonetheless, the sufficiency claim would not merit relief. Because evidentiary sufficiency presents a question of law, the Superior Court's standard of review is *de*

42

*novo* and the scope of review is plenary. **Commonwealth v. Johnson**, 630 Pa. 493, 516, 107 A.3d 52, 66 (2014). Our Superior Court has recently reiterated the sufficiency of the evidence standard:

> Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. . . . When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

**Commonwealth v. Nevels**, 203 A.3d 229, 241 (Pa. Super. 2019) (ellipses in original and citation omitted). Additionally, the appellate court may not reweigh the evidence or substitute its own judgment for that of the fact finder. **Commonwealth v. Hartzell**, 988 A.2d 141, 143 (Pa. Super. 2009) (citation omitted).

In Pennsylvania, criminal homicide is defined as follows: "A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S.A. § 2501(a). First-degree murder is defined as a criminal homicide committed by an intentional killing. Id. An "intentional killing" is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." Id. at § 2502(d). Thus, to obtain a conviction of first-degree murder, the Commonwealth must prove that a human being was unlawfully killed, the defendant was responsible for the killing, and the defendant acted with malice and a specific intent to kill. *See* **Johnson**, *supra* at 517, 107 A.3d at 66.

43

The Commonwealth may sustain its burden of proving each and every element of the crime of homicide beyond a reasonable doubt by means of wholly circumstantial evidence. **Commonwealth v. Perez**, 625 Pa. 601, 621, 93 A.3d 829, 841 (2014) (citations omitted). Moreover, "the use of a deadly weapon on a vital part of the human body is sufficient to establish the specific intent to kill." **Commonwealth v. Hilliard**, 172 A.3d 5, 12 (Pa. Super. 2017) (citation omitted).

Here, it is the element of specific intent to kill which Appellant contends is missing from the facts of this case. Appellant claims the testimony of Cruz-Santiago "was the sole evidence to place [Appellant] at the scene of the crime and not sufficient to establish that Appellant had a specific intent to kill the victim." *See* Second Amended Concise Statement at ¶ 3(A). By assailing the Commonwealth's purported failure to corroborate or bolster Cruz-Santiago's testimony with forensic or other evidence, Appellant ignores the fact that, if believed by the jury, Cruz-Santiago's testimony is enough, by itself, to establish Appellant's participation during the homicide. Our Supreme Court

> has repeatedly refused to endorse the proposition that a particular type or class of evidence which is admitted at trial is, because of its intrinsic nature, insufficient as a matter of law to uphold a conviction – even if it is the only evidence adduced on the question of guilt. *See, e.g.*, **Commonwealth v. Duncan**, 473 Pa. 62, 373 A.2d 1051 (1977) (holding that testimony of a single eyewitness, alone, was sufficient to convict even though it conflicted with other trial testimony); . . . . Even when there are well recognized concerns regarding the reliability of evidence, such as in instances where evidence of guilt is provided by a criminal accomplice who is deemed a corrupt and polluted source, our Court has not categorically regarded all such evidence to be so inherently unreliable that it cannot, by itself, support a verdict of guilt. *See* **Commonwealth v.**

> **Mikell**, 556 Pa. 509, 516, 729 A.2d 566, 570 (1999) ("[A]
> verdict may be predicated upon the uncorroborated testimony
> of an accomplice."). Instead, our Court considers questions
> regarding the reliability of the evidence received at trial to be
> within the province of the finder-of-fact to resolve, and our
> Court will not, on sufficiency review, disturb the finder-of-fact's
> resolution except in those exceptional instances . . . where
> the evidence is so patently unreliable that the jury was forced
> to engage in surmise and conjecture in arriving at a verdict
> based upon that evidence. . . .

**Commonwealth v. Brown**, 617 Pa. 107, 149-50, 52 A.3d 1139, 1165-66 (2012) (some

citations omitted). Thus, while the testimony of an accomplice "should be viewed with

great caution," if such testimony is believed by the fact finder, it is sufficient to sustain a

conviction. **Commonwealth v. Chmiel**, 536 Pa. 244, 251, 639 A.2d 9, 13 (1994)

(stating judge should instruct jury that accomplice testimony is from a corrupt and

polluted source and should be viewed with great caution); *see also* **Commonwealth v.

Johnson**, 180 A.3d 474, 480 (Pa. Super. 2018) (holding, "despite recognizing the

inherent credibility issues that arise with the testimony of accomplices, our Supreme

Court has held that "guilt or innocence may be predicated on uncorroborated testimony

of an accomplice") (citation omitted); **Commonwealth v. Richbourg**, 398 A.2d 685 (Pa.

Super. 1979) (concluding uncorroborated testimony of co-conspirator, if believed, is

sufficient to support conviction); **Commonwealth v. Bradley**, 449 Pa. 19, 21, 295 A2d

842, 844 (1972) (holding "[i]t has long been the law of Pennsylvania that the

uncorroborated testimony of an accomplice is sufficient to convict a defendant");

 **Commonwealth v. Chrostowski**, 171 A. 901, 902 (Pa. Super. 1934) (stating that

there is no rule of law that forbids a conviction on uncorroborated testimony of an

accomplice). It is the sole decision of the fact-finder whether "to believe all, part, or

none" of the testimony presented to it. **Commonwealth v. Cline**, 177 A.3d 922, 925 (Pa. Super. 2017) (*citing* **Commonwealth v. Moreno**, 14 A.3d 133, 136 (Pa. Super. 2011)).

Appellant drastically understates the evidence against him in this case. Appellant's conviction for murder was not based solely upon the uncorroborated testimony of a single co-conspirator or accomplice. At least seven other witnesses testified regarding Appellant's motive to kill the victim, three witnesses testified that Appellant had previously confronted and threatened the victim, one witness testified that Appellant solicited him to help Appellant rob and beat the victim, three witnesses testified that Appellant possessed a gun, and three other witnesses testified that Appellant confessed to hiding the murder weapon. Although there was no corroborative physical evidence presented by the Commonwealth, the witnesses' testimonies were corroborative of each other.

Furthermore, Appellant's involvement in the crime was corroborated by evidence inclusive of cell tower and phone records placing him and his co-conspirator, Cruz-Santiago, together just before the murder and immediately after the murder, and surveillance video corroborating Cruz-Santiago's testimony regarding their activities in the hours just before the murder. This evidence further negated Appellant's version of events.

Finally, the law is clear that fabrication or false and contradictory statements and evidence of self-concealment support an inference of guilt. **Commonwealth v. Jones**, 530 Pa. 591, 616, 610 A.2d 931, 943 (1992). In this case, Appellant actually admitted

that he lied to the police about his relationship with Cruz-Santiago and about the events on the night of the murder. He further denied ever possessing a gun in this country, despite the testimony of at least three credible witnesses, in addition to the co-conspirator, who saw Appellant with a gun.

In this case, the Commonwealth produced enough evidence at trial to form the conclusion, beyond a reasonable doubt, that Appellant had a motive to kill the victim, Appellant made a veiled threat about killing the victim, Appellant possessed a weapon capable of killing the victim, Appellant told others he wanted to threaten, assault and rob the victim, and Appellant solicited one or more persons to help him assault and rob the victim. The jury was free to accept this evidence. The Commonwealth further proved that Appellant had the specific intent to kill the victim based upon the forensic pathologist's testimony that the victim was "executed" with a gunshot to the heart, thus evincing the intent to kill. "[I]t is well-established in Pennsylvania law that the specific intent to kill can be formed in a fraction of a second, and may be found whenever the defendant acts with a conscious purpose to bring about the death of the victim." **Commonwealth v. Chambers**, 602 Pa. 224, 245, 980 A.2d 35, 47 (2009) (citations omitted).

Viewing these facts in the light most favorable to the Commonwealth as the verdict winner, there was sufficient evidence for the jury to find Appellant unlawfully killed Hugo with specific intent and malice, thus supporting his first degree murder convictions. Accordingly, Appellant's first insufficiency claim is meritless.

47

### 2. Burglary

Next, Appellant asserts that the evidence at trial was insufficient to sustain his conviction for burglary because the Commonwealth failed to prove beyond a reasonable doubt that he was not licensed or privileged to enter the premises. *See* Second Amended Concise Statement at ¶ 4. The Crimes Code defines the crime of burglary and in relevant part provides:

> A person commits the offense of burglary if, with the intent to commit a crime therein, the person: (1)(i) enters a building or occupied structure, or separately secured or occupied portion thereof, that is adapted for overnight accommodations in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime therein; . . . .

18 Pa.C.S.A. § 3502(a)(1)(i). Thus, to sustain a conviction for the crime of burglary, the Commonwealth must prove beyond a reasonable doubt that the defendant entered the premises with the contemporaneous intent of committing a crime therein, at a time when the defendant was not then licensed or privileged to enter. **Commonwealth v. Sanchez**, 623 A.3d 943, 973 (Pa. Super. 2013).

Here, Appellant claims the testimony of Cruz-Santiago was insufficient to establish that Appellant was not permitted to be on the premises during the incident in question. *See* Second Amended Concise Statement at ¶ 4(A). The credible testimony of other Commonwealth witnesses proved that Appellant forcibly entered Hugo's home without his permission or the permission of the other residents.

Maria Martinez-Godoy credibly testified that she was awakened during the night by the "banging of doors." N.T.T. at 326. The physical evidence of "blunt force trauma"

48

to Hugo's bedroom door, including fractured trim mold and ripped hinges from the door frame, established that the intruders forced their way into Hugo's bedroom. Id. at 187-88. "A factfinder may conclude beyond a reasonable doubt that when one enters a building by force, he did so with the intent to commit a crime therein." **Commonwealth v. Tingle**, 275 Pa. Super. 489, 419 A.2d 6, 9 (1980) (citations omitted).

The evidence proved that Appellant and his companions forcibly entered Hugo's premises with a contemporaneous intent to commit crimes therein and, thus, sustains Appellant's conviction of first-degree burglary.

### B.    Weight of the Evidence

Appellant further argues that he is entitled to a new trial because the verdicts were against the weight of the evidence. Specifically, Appellant claims: (1) the Commonwealth's primary witness, Cruz Santiago, was not credible; (2) Appellant was credible; and (3) there was a significant lack of physical or forensic evidence tying Appellant to the murder scene. See Second Amended Concise Statement at ¶¶ 1(A)-(C).

A weight of the evidence challenge concedes that there is sufficient evidence to sustain the verdict but questions if that evidence should be believed. **Commonwealth v. Thompson**, 106 A.3d 742, 758 (Pa. Super. 2014) (citation omitted). Our Superior Court has described the standard applied to a weight-of-the-evidence claim as follows:

> When considering challenges to the weight of the evidence, we apply the following precepts. The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the

49

witnesses. Resolving contradictory testimony and questions of credibility are matters for the finder of fact. It is well-settled that we cannot substitute our judgment for that of the trier of fact.

Moreover, [a]ppellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is or is not against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

Furthermore, in order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed. For that reason, the trial court need not view the evidence in the light most favorable to the verdict winner, and may instead use its discretion in concluding whether the verdict was against the weight of the evidence.

**Commonwealth v. Miller**, 172 A.3d 632, 642-43 (Pa. Super. 2017) (internal citations and quotation marks omitted). Applying the standard to this case, the verdict was not against the weight of the evidence.

Two of Appellant's assertions within this challenge to the weight of the evidence argue the credibility of witnesses and their testimony at trial. First, Appellant avers that the Commonwealth's primary witness, Cruz-Santiago, was not credible because he "admitted to deceiving the jury about his prior record while on the stand" and "also told

50

multiple lies to the police before settling on the story he told the jury at trial."[38]  *See*

Second Amended Concise Statement at ¶ 1(A).  Next, Appellant avers that his own

testimony, "in largely narrative form," was credible, and, "[u]nlike Cruz-Santiago, the

Commonwealth was unable to present any evidence of past crimes to impeach

[Appellant's] credibility."  Id. at ¶ 1(B).

Appellant merely asserts his interpretation of the trial evidence and asks the

appellate court to reach a contrary result than the fact finder, based upon his theory of

the case.  As the evidence is sufficient to establish that a killing occurred and that

Appellant deliberately, intentionally and with premeditation participated in that killing,

Appellant's assertion that the very same evidence is without weight is baseless.

Appellant is entitled to no relief on this claim and his appeal should be dismissed.

---

[38]When Cruz-Santiago appeared in court to testify against Appellant, he had a swollen face, cut lip, and bruises on his neck and back. N.T.T. at 776. The day before he was scheduled to testify, three prisoners at LCP pulled Cruz-Santiago into a room on his pod, held him down, and beat him. Id.  He was warned, "this is what's going to happen and its going to get worse if you testify." Id. at 776-77. And yet, Cruz-Santiago showed up to give truthful testimony regarding the events surrounding the murder of Hugo. Id. at 779.

Trooper Gerow testified that when Cruz-Santiago finally admitted his involvement with Appellant and gave his statement to the police, he did not know that the police had his bloody clothes or a surveillance video from the Sunoco placing him with Appellant just hours before the murder. N.T.T. at 874. Moreover, Trooper Gerow stated that, once Cruz-Santiago admitted his part in the murder, he never deviated from his story. Id.

Cruz-Santiago had a significant criminal history prior to his pending charges. N.T.T. at 779. On direct examination, Cruz-Santiago denied having been convicted of any weapons offenses. Id. However, on cross examination, Cruz-Santiago admitted that he was convicted of carrying a concealed weapon and failing to license or register a weapon in 2004. Id. at 853. Although he entered a plea of guilty to the charges, Cruz-Santiago explained that the gun was an antique and was not capable of firing, and that he was trying to sell it for drugs. Id. at 780, 854. Thus, he did not consider this a true weapons charge.

Despite this discrepancy regarding his prior criminal record, the jury found Cruz-Santiago's testimony credible. The jury was charged with making credibility determinations of witnesses, and neither the trial court nor the appellate courts can substitute their judgment for that of the trier of fact. **Miller**, 172 A.3d at 642-43.

51

Next, Appellant avers that no physical evidence placed him at the scene of the murder. *See* Second Amended Concise Statement at ¶ 1(C). It is true that Appellant's DNA was not located at the murder scene.[39] N.T.T. at 276. However, Maria Martinez-Godoy provided credible testimony that she heard Appellant's voice "screaming" and "shouting" at Hugo prior to his murder, and she told multiple people immediately after the murder that it was Appellant's voice that she recognized in their house. Id. at 329-30.

The totality of the Commonwealth's evidence in this case was not tenuous, vague, or uncertain, and the verdict was not so contrary as to shock the court's conscience.

## C.     Dismissal of Appellant's Post-Trial Motion

Lastly, Appellant claims it was trial court error to deny his post-trial motion in which he made the same weight of the evidence challenge that he asserts on appeal. For the reasons set forth above, the verdict was not so contrary as to shock the court's conscience. Therefore, the post-trial motion was properly denied.

---

[39]There was a significant amount of testimony regarding the lack of identifiable DNA at the crime scene. Cruz-Santiago testified that Appellant wore long dish-washing gloves, N.T.T. at 826, which would have prevented any fingerprints from being left at the scene. Trooper Gerow testified that Appellant had no evidence of scratches or cuts to his face or arms, Id. at 542-43, which suggests Appellant left no blood at the scene or skin cells under the victim's fingernails. This is consistent with Appellant wearing long gloves which covered his hands and forearms, and a ski mask which covered his face. *See* Id. at 826. The expert conclusion was that the DNA "stew" recovered from the crime scene was so mixed with the victim's blood as to render a sufficient quantity of other DNA impossible to identify. Id. at 543-44.

## III.     Conclusion

For the reasons set forth above, Appellant Jose Santos Ferrufino was properly found guilty of first-degree murder and burglary.  Therefore, the convictions should be affirmed.

Accordingly, I enter the following: